IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA,

   v.

DONALD WILSON BARNETTE, JR.,

   Defendant.

CRIMINAL ACTION FILE

NO. 4:16-CR-00023-HLM-WEJ-1

## <u>NON-FINAL REPORT AND RECOMMENDATION</u>

This matter is before the Court on defendant Donald Wilson Barnette, Jr.'s Motion to Suppress [10]. On January 26, 2017, the Court conducted an evidentiary hearing [16] regarding the Motion, which has been transcribed [18] (hereafter "Tr."). The parties have also briefed the issues raised. (<u>See</u> Def.'s Br. [21]; Gov't Resp. [32]; Def.'s Reply [33].) For the reasons explained below, the undersigned **RECOMMENDS** that the Motion be **DENIED.**

# I. STATEMENT OF FACTS

## A. Paulding County Officers Patrol on January 2, 2016

On January 2, 2016, Detective Steve Sorrells[1] was on patrol with the Paulding County Sheriff's Department, driving a marked patrol car. (Tr. 6, 36.) Because Det. Sorrells had only become a deputy sheriff in December 2015 and was still in training, Deputy Andrews,[2] a training officer, accompanied him. (Id. at 4-6, 8.) Deputy Andrews had over ten years' experience with the department. (Id. at 8.) Det. Sorrells was trained on the traffic laws in Georgia and had a pamphlet describing those laws in the patrol car. (Id. at 5-7, 17-18; Gov't Ex. 5.) The patrol car was equipped with a dashboard camera, which turned on whenever the car's blue emergency lights were activated. (Tr. 10-11, 29, 32-33; Gov't Ex. 3 (the "Dash Cam Video").) Once activated, the dashboard camera automatically backed up one minute, so that it recorded activity that occurred in the minute leading up to when the blue lights were engaged. (Tr. 33.)

---

[1] Mr. Sorrells is now a detective with the Paulding County Sheriff's Department. (Tr. 4.)

[2] Deputy Andrews's first name does not appear in the record.

## B.    The Officers Notice Mr. Barnette

At 6:33:46 p.m., the officers were exiting a neighborhood onto Dallas Acworth Highway (Highway 381) when they observed Mr. Barnette pass them in a black Chevrolet Tahoe.[3]  (Tr. 6, 23-24, 32, 35.)  Det. Sorrells testified that Deputy Andrews told him to follow the vehicle because he noticed that its window tint looked too dark.  (Id. at 6-7, 91.)  As they followed the Tahoe, Deputy Andrews ran its license plate number through the Georgia Crime Information Center ("GCIC") on the computer in their patrol car.  (Id. at 7, 9, 31, 39-41.)  Det. Sorrells testified that while following Mr. Barnette, he could see the license plate on the Tahoe but did not recognize it as a dealer plate.  (Id. at 38.)  The information that came back from GCIC on the computer in the patrol car was that the tag was not registered to the Tahoe, which is a violation of O.C.G.A. § 40-2-8.[4]  (Id. at 7, 94.)  Thus, the officers activated the patrol car's blue emergency lights to initiate a traffic stop.  (Id. at 9, 31, 39-41, 48, 94.)  Det.

_____

[3] The officers activated the blue lights at 6:34:28 p.m.; thus, the dash camera began recording at 6:33:28 p.m.  (Tr. 33-34; see also Dash Cam Video.)

[4] This section governs, inter alia, operation of vehicles that are unregistered or lack current license plates, and provides as follows:  "It shall be a misdemeanor to operate any vehicle required to be registered in the State of Georgia without a valid numbered license plate properly validated, unless such operation is otherwise permitted under this chapter. . . ."  See O.C.G.A. § 40-2-8(b)(2).

Sorrells testified that at the time of the stop, "all we knew was the tag wasn't assigned to that vehicle." (Id. at 94.)

The officers had also called dispatch to ascertain the Tahoe's license plate information while they followed Mr. Barnette; this call was completed at 6:34:43 p.m. (Tr. 31, 40, 48-49.) Government Exhibit 4, the Computer Assisted Detail Report[5] (or "CAD Report"), shows that it took over five minutes for dispatch to obtain the license plate information and respond to the officers; the CAD Report reflects that the license plate was a dealer tag assigned to Carl Black Chevrolet. (Id. at 31, 39-41, 88, 94; CAD Report at 2.)

### C.    Officers Approach Mr. Barnette

Around 6:37 p.m., about three minutes after activating the blue emergency lights, Mr. Barnette pulled over and Det. Sorrells exited the patrol car and approached him. (Tr. 9.) Det. Sorrells did not recognize Mr. Barnette and had not met him previously. (Id. at 10.) Det. Sorrells informed Mr. Barnette that the license plate did not come back as registered to the vehicle he was driving, and

_____

[5] The CAD Report records everything that happened during the traffic stop communicated between the deputies and dispatch over the radio. (Tr. 11-12, 87-88.) The CAD Report records only in hours and minutes and does not record in seconds. (Id. at 34, 87-88.)

4

asked him for his driver's license.  (Id. at 9.)  Mr. Barnette told Det. Sorrells that the vehicle belonged to the Carl Black auto dealership where he was employed and that the license plate was a dealer plate.  (Id. at 9-10, 43-44.)  Det. Sorrells stated to Mr. Barnette that he had "never seen a dealer plate that didn't say 'dealer' on it," but did not step back to view the plate again to confirm whether Mr. Barnette was telling the truth.  (Id. at 43-44, 50-51, 89.)  Det. Sorrells testified at the hearing that he could see that the license plate on the Tahoe said "dealer plate" while the officers were stopped behind it and as he walked toward the car to approach Mr. Barnette.[6]  (Id. at 43-44.)

Mr. Barnette explained to Det. Sorrells that he did not own the Tahoe, but was in the process of purchasing it, although he had no paperwork to prove this.  (Tr. 15-16, 25, 51.)  Mr. Barnette also stated that the Tahoe was covered under Carl Black's "balloon" insurance policy.  (Id. at 15.)  Mr. Barnette provided officers with a telephone number for the general manager at Carl Black; however, Det. Sorrells could not remember if anyone called that person.  (Id. at 15, 25,

---

[6] As Mr. Barnette observes, the license plate had the phrase "New Vehicle Dealer" printed below the tag number.  (See Tr. 29-30, 89; Gov't Ex. 1.)

53.)[7] Mr. Barnette did not have proof of insurance or registration in the vehicle. (Id. at 10.)  Det. Sorrells testified that Georgia law requires every car in the state to have insurance.[8] (Id. at 16.)

Det. Sorrells then returned to the patrol car and called dispatch to obtain a history on Mr. Barnette using the information found on his driver's license.  (Tr. 44, 53, 55; CAD Report at 1-2.)  Det. Sorrells also searched the license plate number again to see if he could find any insurance information; however, the information that came back was that the insurance was "unknown."  (Id. at 13.) Det. Sorrells decided to run the VIN number to see if the vehicle was stolen or if it had insurance under the VIN number.  (Id. at 13-14.)

### D.    Mr. Barnette is Ordered to Exit the Vehicle

Det. Sorrells asked Mr. Barnette to step out of the car, as was routine when officers run a VIN number, and patted him down for officer safety to make sure

---

[7] Det. Sorrells testified that even if someone had stated there was insurance on the vehicle, he would not have been able to rely on that information. (Tr. 26, 89.) He had to rely solely on the information from GCIC, dispatch, or from any paperwork inside the vehicle.  (Id. at 26, 89.)

[8] O.C.G.A. § 40-2-137(d)(2) provides that "[i]t shall be the duty of the owner of [a] motor vehicle to obtain minimum motor vehicle insurance coverage and it shall be the duty of the owner's insurer to provide proof of such coverage to the department within 30 days of the date of such notice, pursuant to the requirements of subparagraph (b)(1)(A) of this Code section."

he had no weapons. (Tr. 13-14, 26, 45, 90-91.) Mr. Barnette informed officers that he had some knives in his pockets. (Id. at 14, 27, 46.) After Det. Sorrells performed a pat-down search of Mr. Barnette and stepped away, Deputy Andrews directed him to go back to search Mr. Barnette's pockets, which he did.[9] (Id. at 55-56, 61-63, 90-91.) Det. Sorrells testified that it was routine to search pockets during a pat-down if a person informed the officers that they had a weapon, as Mr. Barnette had. (Id. at 45-46.) Deputy Andrews then asked Mr. Barnette for permission to search the Tahoe and Mr. Barnette declined, stating at first that he could not give permission because he did not own the vehicle, and then definitively stating that the officers could not search the vehicle. (Id. at 57-58.) Det. Sorrells testified that it would not be routine during a traffic stop to request to search a vehicle. (Id. at 60.)

_____

[9] It is clear from the Dash Cam Video that Deputy Andrews was on a telephone call during some portion of the pat-down search. (See Dash Cam Video 6:40:45-6:41:59, 6:42:30-6:43:46, and 6:45:13.) The parties disputed during the hearing the length and contents of this call. (See Tr. 64-66.) After reviewing the Dash Cam Video again, the Court agrees with statements counsel made during the hearing that the audio is very difficult to hear. Thus, the Court can draw no inferences from it.

### E. Officers Continue to Attempt to Locate Insurance Information

Dispatch confirmed at 6:45:54 p.m. that the license plate on the car was one of seven assigned to Carl Black, but the "plates [were] not assigned to a vehicle." (Tr. 30-31, 71-73, 88, 93-94; CAD Report at 2.) Dispatch provided results from the VIN search at 6:46:09 p.m., which were that insurance was unknown, and that the Tahoe was registered to a Mr. Joey Alan Brewer (likely the previous owner). (Tr. 13-15, 27, 73, 88, 94; CAD Report at 2-3.) Thus, the officers continued to lack proof or confirmation that the Tahoe was insured. (Tr. 71, 89, 94.) Finally, at 6:46:27 p.m., dispatch provided the history requested of Mr. Barnette, including that he was a convicted felon. (Id. at 74-75.)

During the hearing, Det. Sorrells testified that he is now aware from his training and experience that dealer plates are not assigned to a particular vehicle, and that car dealerships such as Carl Black can purchase fleet insurance. (Tr. 30, 52-53.) Det. Sorrells further testified that it is not common practice to stop cars that are being operated with dealer plates; that he is now aware that those plates are not assigned to a particular vehicle; and that in the eleven months he was on street patrol he did not stop all cars with dealer plates. (Id. at 93.) However, Det. Sorrells further testified that he did not know about or understand fleet tags or insurance at the time of the stop on January 2, 2016. (Id. at 89-90.)

## F.     Officers Inventory and Tow the Vehicle

Because there was no proof of insurance found on the Tahoe, the officers decided to have the vehicle towed.  (Tr. 16; Gov't Ex. 5.)  Pursuant to the Paulding County Sheriff's Department towing policy, the deputies had to inventory the Tahoe on the side of the road before it could be towed.  (Tr. 18, 42, 77; Gov't Ex. 2 (the "Inventory Policy").)  This was because pursuant to the Inventory Policy, the Tahoe would be towed to a public site, rather than the Sheriff's Department, which had no means to secure the vehicle.   (Tr. 18-20; Inventory Policy.)  Det. Sorrells and Deputy McArthur,[10] who had arrived to assist, conducted the inventory from 6:55:39 p.m. through 7:11:20 p.m.  (Tr. 20-21, 79, 86.)  They found a baggy with pills that appeared to be Xanax in the sunglasses holder and a loaded .22 four-barrel pistol in the center console.  (Id. at 20-21.)  Mr. Barnette was then placed under arrest for possession of drugs, possession of a firearm by a convicted felon, and operating a vehicle without insurance.  (Id. at 21-22, 80-81.)  As defendant observes, the deputies did not discuss the Tahoe's window tint at any time during the stop or issue a citation for a traffic violation relating to the window tint.  (Id. at 22-23, 31, 39, 92.)

_____

[10] Deputy McArthur's first name does not appear in the record.

## II.    **THE INDICTMENT**

On October 11, 2016, a grand jury in the Northern District of Georgia returned a one-count Indictment [1] against defendant.  Count One alleges that, on January 2, 2016, in the Northern District of Georgia, defendant Barnette, having been convicted of at least one prior felony offense (i.e., possession of methamphetamine in the Superior Court of Cobb County, Georgia, on March 10, 1998; possession of methamphetamine and other controlled substance with intent to distribute and possession of cocaine in the Superior Court of Cobb County on November 23, 2009; and possession of a firearm by a convicted felon in the Superior Court of Cobb County on April 9, 2014), did knowingly possess an EIG/Tangfolio .22 caliber handgun, said firearm having affected and moved in interstate and foreign commerce, in violation of 18 U.S.C. § 922(g)(1).  The Indictment also contains a forfeiture provision.

## III.    **DISCUSSION**

Through his motion to suppress, Mr. Barnette challenges the stop and search of the Tahoe, the seizure of evidence obtained during that search, and his subsequent arrest.  Specifically, he contends that the officers pulled him over and decided to tow and therefore inventory the Tahoe under the pretext of its too-dark window tint and lack of registration and proof of insurance, when their actual

motivation was to search the Tahoe to find incriminating evidence. He thus seeks suppression of the gun and pills found in the Tahoe as products of an unlawful traffic stop and subsequent search. (See generally Def.'s Br.)

### A.    The Officers Had Probable Cause to Stop the Tahoe

The Government bears the burden of establishing the legality of any challenged search or seizure. See Coolidge v. New Hampshire, 403 U.S. 443 (1971); see also United States v. Holloway, 290 F. 3d. 1331 (11th Cir. 2002). Here, Mr. Barnette contends that the Government cannot show that the search was legal, because he argues that the officers did not have probable cause to stop the Tahoe. Specifically, he contends that the officers' claim that the license plate did not match the vehicle was a pretext given both Det. Sorrells's testimony that he knew before approaching Mr. Barnette that the license plate was a dealer tag (and therefore would not be assigned to an individual vehicle) and the record from the Dash Cam Video and the CAD Report showing that it took dispatch five minutes to obtain the Tahoe's registration information (rendering it impossible for the officers to have looked up the same information on the patrol car computer in less than one minute). (Def.'s Br. 5-8.) Mr. Barnette further argues that the officers' claim that the Tahoe's window tint was too dark was pretextual given that it was never mentioned during the traffic stop. (Id.)

The Government responds that it has met its burden to establish that the stop and search were legal because the officers had probable cause to stop the vehicle based on Det. Sorrells's testimony that the officers noticed first that its window tint was too dark and next that that the license plate was not registered to the vehicle. (Gov't Resp. 6-8.) The Government further responds that while the Dash Cam Video and CAD Report show that the officers did not receive confirmation from dispatch regarding the license plate until after they initiated the traffic stop, pursuant to Det. Sorrells's undisputed testimony, they were able to obtain this information through GCIC on the laptop computer in the patrol car before activating the emergency lights. (Id. at 8-9.) The Government further contends that even if the officers were ultimately mistaken regarding the Tahoe's insurance, their belief was reasonable given the totality of the circumstances and can thus support probable cause. (Id. at 9-10.)

In reply, Mr. Barnette contends that Det. Sorrells's testimony that the officers had information from GCIC before they activated the blue lights is "simply not believable" because the CAD Report and Dash Cam Video show that Mr. Barnette passed by the officers less than one minute before the blue lights were activated. (Def.'s Reply 2.) Defendant reiterates his argument that because it took dispatch five minutes to return this same information, it is not believable

that the officers could have obtained the information in less than one minute; moreover, defendant contends that it is not believeable that the officers would have both looked up the license plate on their own and called dispatch seeking the very same information at the same time.  (Id. at 1-3.)

### 1.    Governing Standard

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Temporary detention of individuals during the stop of an automobile by the police constitutes a "seizure" of "persons" within the meaning of this provision.  See Delaware v. Prouse, 440 U.S. 648, 653; see also (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 556 (1976).  An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances.  As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.  See Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977).

The Supreme Court defines "probable cause" as a "fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  The determination of whether probable cause

13

exists must be made in light of the "totality of the circumstances." United States v. Clark, 337 F.3d 1282, 1286 (11th Cir. 2003) (citing United States v. Cortez, 449 U.S. 411, 417 (1981)). Thus, probable cause exists when facts and circumstances within the knowledge of a law enforcement officer are sufficient to cause a person of reasonable caution to believe that a crime has been committed. Michigan v. DeFillippo, 443 U.S. 31, 37 (1979); see also United States v. Jimenez, 780 F.2d 975, 978 (11th Cir. 1986) (per curiam). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting Cortez, 449 U.S. at 418)).

Even if the officers improperly used the traffic violations of too-dark window tint and the license plate not matching the Tahoe as a pretext to stop Mr. Barnette to investigate criminal activity, this would be irrelevant if they ultimately had probable cause to stop the vehicle. See Whren v. United States, 517 U.S. 806, 817 (1996) (holding that the subjective intent of a police officer is not constitutionally relevant if the officer actually had probable cause to stop the vehicle for a traffic violation); see also United States v. Holloman, 113 F.3d 192, 194 (11th Cir. 1997) (per curiam) ("The [Whren] decision conclusively refutes

the notion that ulterior motives may invalidate police conduct that is justified on the basis of probable cause to believe that a violation of law has occurred.").

Thus, so long as there was probable cause to believe a traffic violation had occurred, officers' other motives for making a stop are not constitutionally relevant. See, e.g., Holloman, 113 F.3d at 196 (approving use of pretextual "rolling patrols" to further drug interdiction efforts, so long as the initial traffic stops were based on probable cause to believe that a traffic violation had occurred). Finally, as the Government observes, even if the officers were mistaken in their beliefs regarding the Tahoe's window tint, license plate, and insurance, these beliefs could support probable cause if they were reasonable under the circumstances. See United States v. Gonazalez, 969 F.2d 999, 1004-05 (11th Cir. 1992); Arizona v. Evans, 514 U.S. 1, 15-16 (1995) (arrest made in good faith relying on an erroneous computer printout stating a warrant existed).

### 2. Analysis

The undersigned concludes that officers acted reasonably under the circumstances and had probable cause to stop Mr. Barnette. As Det. Sorrells testified, the officers first noticed the Tahoe because its window tint looked too dark. As the officers followed the Tahoe, they simultaneously called dispatch and entered the license plate information into the patrol car's laptop and discovered

that the license plate did not match the vehicle. This was sufficient to create a reasonable belief that at least one traffic violation (i.e., of O.C.G.A. § 40-2-28) had occurred, which established probable cause to pull Mr. Barnette over. The Court credits Det. Sorrells's testimony that they decided to pull the vehicle over based on these potential traffic violations. See United States v. Johnson, 307 F. App'x 372, 374 (11th Cir. 2009) (per curiam) (probable cause existed to stop vehicle displaying an improper tag); Prouse, 440 U.S. at 659 (detention of a motorist is reasonable where probable cause exists to believe that a traffic violation has occurred). That the officers abandoned the potential window tint violation once they discovered the more serious issues (like the lack of insurance) does not render this belief unreasonable.

Mr. Barnette's argument that the officers could not have learned that the license plate did not match the Tahoe during the short period of time between when he drove past them and when they activated the blue lights is not well taken. That dispatch took five minutes to respond to the officers' request for information does not contradict Det. Sorrell's testimony that the officers were able to complete a GCIC search in the patrol car in a shorter amount of time. Moreover, to the extent defendant argues that it was not reasonable or likely that the officers would have sought to obtain information on the license plate from multiple

sources at the same time, Det. Sorrells's testimony that they did so is undisputed, and it is reasonable under the rushed circumstances occurring during a traffic stop that the officers would have used multiple methods to obtain the same necessary information.

Defendant contends that the license plate on the Tahoe was clearly a dealer plate, and the officers knew that such plates are not assigned to any particular vehicle. Thus, he argues that the fact that the license plate did not match the vehicle could not have provided support for a belief that a license plate-related traffic violation had occurred, and cannot establish probable cause for the stop. Mr. Barnette is correct that it is undisputed that the plate read "New Vehicle Dealer," and that Det. Sorrells noticed that detail after stopping the Tahoe. This, however, is insufficient to defeat the officers' reasonable belief that Mr. Barnette had violated at least one of Georgia's traffic laws. As Det. Sorrells testified, at the time the blue lights were activated, he was unaware that the license plate was a dealer plate, and only knew that it did not match the vehicle. As a deputy sheriff less than one month into training, it was reasonable under the circumstances that Det. Sorrells may not have immediately recognized the plate as a dealer plate.

Although Det. Sorrells did realize that the license plate was a dealer plate once Mr. Barnette had been stopped, it was not unreasonable for the officers to continue to detain Mr. Barnette as they sought to ascertain the ownership of the Tahoe. As Det. Sorrells testified, even after he became aware that the license plate was in fact a dealer plate, it is undisputed that defendant did not have papers showing that he owned the car and could not produce insurance information. Perhaps most importantly, despite the fact that the officers did receive confirmation that the license plate was registered to Carl Black, when the officers ran the Tahoe's VIN, the vehicle itself did not come back as registered to Carl Black and the insurance information came back as "unknown."

Based on the facts in front of them at the time they activated the blue lights, Det. Sorrells knew only that the license plate did not match the Tahoe. During the stop, the officers discovered the following: the license plate belonged to Carl Black and was not registered to the Tahoe; the Tahoe was registered to another individual; Mr. Barnette had no paperwork showing ownership or otherwise supporting his claim that he was currently making payments on the Tahoe; and multiple sources confirmed that the vehicle's insurance status was "unknown." These facts taken together were sufficient to create a reasonable belief that a traffic violation had occurred both when the lights were activated and later. This

is particularly true when coupled with Det. Sorrells's undisputed testimony that he could not have relied on any third-party statements regarding proof of insurance.  Accordingly, the undersigned **REPORTS** that the officers' decision to stop Mr. Barnette was supported by probable cause and, as discussed further below, their decision to tow (and therefore inventory search) the Tahoe was reasonable under the circumstances.

### B.    The Search Was Not Pretextual

Mr. Barnette contends that the officers impounded the Tahoe in order to justify a search after he refused to grant them consent to do so, and that this use of an inventory search as a pretext to "rummage for investigative purposes" is unreasonable under the Fourth Amendment.  (Def.'s Br. 6-8.)  The Government responds that the officers properly searched the Tahoe pursuant to the Inventory Policy before towing it to a public lot with no security.  (Gov't Resp. 8-11.)  Mr. Barnette reiterates his arguments in reply, adding that the search was pretextual for the additional reason that "the very first thing Detective Andrews does after having [defendant] get out of the car to allegedly check the VIN number, is to ask for permission to search the vehicle," despite Det. Sorrells's testimony that it was not common to search a vehicle during a minor traffic stop.  (Def.'s Reply 1-5.)

"[When] the police take custody of any sort of container [such as] an automobile . . . it is reasonable to search the container to itemize the property to be held by the police. [This reflects] the underlying principle that the fourth amendment proscribes only *unreasonable* searches." South Dakota v. Opperman, 428 U.S. 364, 371 (1976) (internal citations omitted, emphasis in original). Courts recognize that "inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." Colorado v. Bertine, 479 U.S. 367, 372 (1987). However, inventory searches serving as "a ruse for a general rummaging in order to discover incriminating evidence" are unlawful. See Florida v. Wells, 495 U.S. 1, 4 (1990). Additionally, inventory searches serving as "a pretext for an investigat[ive] search" were prohibited by the Inventory Policy. (See Inventory Policy.)

As discussed above, the officers could not determine whether the Tahoe had insurance and whether the license plate matched the vehicle; thus, they properly determined that the Tahoe could not be driven according to Georgia law. Because the Tahoe could not be driven, officers decided to tow it, and pursuant to the Inventory Policy, performed an inventory search. It was during this search that the officers located the firearm and pills. Because the officers knew from

their communications with dispatch that Mr. Barnette was a convicted felon, they lawfully seized the items and placed him under arrest.  See Bertine, 479 U.S. at 372  (noting that evidence or contraband found during the course of an inventory search may be seized if:  the inventory was administered in good faith and not for the sole purpose of investigation; and the inventory procedure was followed pursuant to reasonable and standardized police regulations).

Defendant is correct that "[a]n inventory search is not a surrogate for investigation, and the scope of an inventory search may not exceed that necessary to accomplish the ends of the inventory."  See United States v. Khoury, 901 F.2d 948, 958 (11th Cir. 1990).  However, there is no evidence showing that the officers' decision to tow the Tahoe was not made in good faith or that the search itself exceeded the scope of the Inventory Policy.  Mr. Barnette contends that Det. Andrews asked him for permission to search the vehicle soon after checking the VIN, which was unusual in the context of a traffic stop.  However, these facts alone do not demonstrate an improper purpose or contradict Det. Sorrells's testimony that the officers searched the Tahoe pursuant to the Inventory Policy because it had to be towed to a public lot without security.  Those facts are, in other words, alone insufficient to upset the officers' reasonable actions in conducting a routine inventory of the vehicle pursuant to Paulding County

Sheriff's Department policy once they determined it could not be driven lawfully. Accordingly, the undersigned **REPORTS** that the officers' decision to search the Tahoe and subsequent seizure of evidence found therein was proper and reasonable under the circumstances.

IV.  <u>**CONCLUSION**</u>

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Motion to Suppress [10] be **DENIED**.

**SO RECOMMENDED**, this 1st day of June, 2017.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE